UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

   -v-

CARLOS MANUEL MONTERO ZAPATA,

      Defendant.

---

25-cr-201 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

On May 5, 2025, Carlos Manuel Montero Zapata ("Montero") appeared before the Court to plead guilty to participation in a narcotics and firearms trafficking conspiracy, pursuant to a lengthy, complex, and legalistic form agreement to which Montero, who has a tenth-grade education, had purportedly agreed. At the plea hearing, the Court ascertained that even the Government's attorney did not have a clear understanding of various provisions in Montero's plea agreement. Nonetheless, Montero and his counsel remained eager to go forward with the plea, since it would reduce his exposure from the ten-year mandatory minimum term of imprisonment that would apply if he were convicted at trial of all four counts of the original criminal complaint against him to the five-year mandatory minimum term of imprisonment that would apply if he pled guilty to the two counts offered by the plea bargain. Still, in view of the Court's obligation under the Federal Rules of Criminal Procedure to independently evaluate each plea agreement that comes before it, the Court adjourned the plea hearing and, at the Government's suggestion, invited supplemental briefing, which

has now been received. Upon review of that briefing, the Court concludes, somewhat reluctantly, that it has no choice but to go forward with the plea, for the reasons set forth below.

Under the now-endemic system of "plea bargaining," about 98% of all federal criminal indictments are resolved through guilty pleas to lesser offenses. See United States v. Lajeunesse, 85 F.4th 679, 693 & n.8 (2d Cir. 2023) (collecting statistics). The driving force that leads most defendants to forego trial and enter into such pleas is a desire to reduce the lengthier terms of imprisonment mandated or recommended by law following conviction at trial.[1] The Government, however, not content with the benefits of simply avoiding the time, expense, and uncertainty of trials, conditions such plea bargains on a defendant's acceptance of numerous broad concessions embodied in a binding written agreement such as the one here.

Federal judges throughout the nation have long warned that such agreements require defendants to forgo critical rights and protections. See, e.g., United States v. Osorto, 445 F. Supp. 3d 103, 104-10 (N.D. Cal. 2020); United States v. Chua, 349 F. Supp. 3d 214, 217-20 (E.D.N.Y. 2018); United States v. Melancon, 972 F.2d 566, 574-80 (5th Cir. 1992) (Parker, J., concurring specially). But so great is the disparity in bargaining power between the Government and the typical defendant that the defendant, as a practical matter,

---

[1] See generally Jed S. Rakoff, WHY THE INNOCENT PLEAD GUILTY AND THE GUILTY GO FREE (2021).

has no choice but to accept the Government's plea agreement exactly as worded.

One typical requirement of such written agreements is a defendant's very broad waiver of his right of appeal, even, for example, where he later learns that subsequent court decisions suggest that the conduct he admitted may not violate the statute to which he pled guilty or that the statute itself may be unconstitutional. As early as 1995, the Justice Department began directing prosecutors to draft plea agreements so as to embody a very broad waiver of the defendant's right of appeal. See United States v. Raynor, 989 F. Supp. 43, 44-45 (D.D.C. 1997) ((quoting United States Dep't of Justice Memorandum for All U.S. Attorneys from John C. Keeney, Acting Assistant Attorney General, at 3 (Oct. 4, 1995)), abrogated on other grounds as recognized in United States v. Powers, 885 F.3d 728, 732 (D.C. Cir. 2018). And while most courts continue to indulge the fiction that plea agreements are negotiated contracts that should be enforceable as such, the truth is that the broad waiver of the right of appeal contained in these contracts of adhesion is almost always presented by the Government as non-negotiable.

Against this background, the Court turns to the underlying allegations and plea agreement in this case:

Montero is alleged to have sold firearms and narcotics to two undercover officers between June and September 2024. Letter from Defense Counsel, June 9, 2025 ("Def. Letter") at 1. In December

2024, Montero was arrested after he approached police officers who had detained someone else. Id. at 2.

On December 4, 2024, Montero was charged by complaint with four drugs and firearms offenses. See id. Count One charged Montero with conspiracy to distribute narcotics, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846; that count carries a statutory mandatory minimum sentence of five years' imprisonment. See Letter from Government, May 19, 2025 ("Gov't Letter") at 1. Count Two charged Montero with using, possessing, and carrying a firearm during and in relation to the drug trafficking conspiracy charged in Count One, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; that count also carries a five-year mandatory minimum sentence, but it must be served consecutive to any other term of incarceration imposed. Id. Count Three charged Montero with firearms trafficking conspiracy, in violation of 18 U.S.C. § 933(a)(3), which does not carry a mandatory minimum sentence. Id. Count Four charged Montero with firearms trafficking, in violation of 18 U.S.C. §§ 933(a)(1) and 2, which also does not carry a mandatory minimum sentence. See ECF No. 1 at 2. Were Montero to plead or be found guilty on Counts One and Two, he would face a mandatory minimum sentence of ten years' imprisonment and a maximum sentence of life imprisonment. See Def. Letter at 2.

Soon after his arrest, Montero entered into discussions with the Government about the terms of a potential guilty plea. See id. In the initial stages of those discussions, Montero agreed to waive

speedy indictment. See id. He received what his counsel characterizes as limited discovery, and the Government allegedly rebuffed his requests for further discovery materials, at least in part on the grounds of "law enforcement sensitivities." See id.

In March 2025, Montero requested that the Government permit him to plead guilty to violating 21 U.S.C. § 841(b)(1)(C), a provision that does not carry a mandatory minimum sentence. See id. According to Montero's counsel, the Government rejected that request and instead offered to permit Montero to plead guilty to Counts One and Three, which together carry a mandatory minimum sentence of five years' imprisonment. See id.; Gov't Letter at 1. In view of the Government's offer, Montero's counsel sought further discovery in the form of laboratory reports, photographs of seized firearms, and evidence concerning the Government's proposed proof that Montero knew he had conspired to provide firearms to certain dangerous persons. See Def. Letter at 2. According to Montero's counsel, the Government refused to provide that additional discovery and also refused to consider other adjustments to the proposed plea agreement that would favorably affect the calculation of Montero's sentencing range under the United States Sentencing Guidelines (the "Guidelines"). See id. Notwithstanding these rejections, on May 5, 2025, Montero accepted the Government's plea offer and executed a written plea agreement with the Government. See Gov't Letter at 1 and Ex. A ("Plea Agreement"); Def. Letter at 2.

The plea agreement that Montero executed with the Government takes the form of a seven-page, single-spaced letter addressed to Montero's counsel. See generally Plea Agreement. By the Court's count, the agreement comprises approximately 2,820 words, many couched in legal terms that no layperson could possibly understand without considerable input from counsel, e.g., "The defendant agrees that with respect to any and all dismissed charges the defendant is not a 'prevailing party' within the meaning of the 'Hyde Amendment,' Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law," Plea Agreement at 2. According to the Government, the agreement "is based on language that [the United States Attorney's Office] uses in many plea agreements that are not unique to this specific case." See Gov't Letter, Ex. B ("Tr.") at 23:6-8. Indeed, the Court recognizes the agreement as the current version of the Government's standard form plea agreement in the Southern District of New York.

The agreement first identifies the charges to which the Government will accept Montero's guilty plea, indicating for each count the maximum and any mandatory minimum term of imprisonment, the maximum fine, the amount to be forfeited, and other details. See Plea Agreement at 1-2. The agreement then recites that "the parties hereby stipulate" to a detailed calculation of the Sentencing Guidelines, including a stipulated Guidelines range of 78 to 97 months' imprisonment, with a mandatory minimum of 60 months. See id. at 2-4. While the agreement notes that neither the Probation Office

nor the Court is bound by this calculation, it provides that "neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein[, n]or will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines." Id. at 4. In other words, neither the Probation Office nor the Court will have the benefit of the adversary system when it comes to calculating the Guidelines. And while a few judges, including this judge, regard the Guidelines as arbitrary and irrational,[2] many judges will either directly follow the Guidelines in imposing sentence or give them very substantial weight.

While the defendant is thus required not to contest the Guidelines calculation, several escape valves are available to the Government. For example, the agreement expressly provides that

_____

[2] Just to give one example, the agreement here stipulates that four levels will be added to the calculation of the total offense level "because at least one firearm had an altered or obliterated serial number." Plea Agreement at 3. But nowhere in the plea agreement, the 611-page Guidelines Manual that provides for this increase, or anywhere else, is there an explanation of how the choice of four levels was arrived at; or how such serial number alteration on as few as one firearm warrants an addition of four levels (as opposed, say, to one level, two levels, seven levels, or ten levels); or what consideration, if any, should be given to which conspirator made the alteration and whether or not the defendant himself even knew of it; or why the four-level increase for such alteration is the same as the four-level increase also here given for the seemingly more serious fact of the defendant's possessing a firearm in connection with drug trafficking, see id. As this example illustrates, the Guidelines' fetish with superficial arithmetic "consistency" effectively ignores, or serves to distract a court from considering, the multiple individual differences that combine to form the total mix of facts and circumstances that is at the heart of any fair sentencing.

nothing in the agreement "limits the right of the Government to seek denial of the [three-level decrease] for [the defendant's] acceptance of responsibility . . . if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence." Id. at 4 (emphasis supplied). In practice, what this means is that the defendant, in allocuting to the Court at the time he enters his plea, commonly reads from a script previously reviewed by the Government that eschews any reference to any possible defense or mitigating circumstance.

Notwithstanding that the Court, in taking any guilty plea, is obliged to inform a defendant of the various basic constitutional rights he is waiving by choosing to plead guilty, see Fed. R. Crim. P. 11(b)(1), the Government uses its excess of power in the plea-bargaining context to extract still further waivers of a defendant's legal rights. While there are many such waivers throughout the plea agreement, nearly all of which the Government presents as non-negotiable, the most problematic provision, and the one that most troubled this Court at the initial plea hearing in this case, is the twenty-eight-line paragraph limiting the defendant's right of appeal. The paragraph begins with an absolute prohibition to any challenge to the fact of his conviction of the offenses he is pleading to. "It is agreed that the defendant will not file a direct appeal or otherwise challenge, pursuant to 28 U.S.C. § 2255 or any

other provision, the defendant's conviction." Plea Agreement at 5. Just how immensely broad this waiver is is particularized in the immediately following sentences, which provide, inter alia, that "the defendant waives the right to challenge the conviction based on (1) any non-jurisdictional defects in the proceedings before entry of this plea, (2) a claim that the statute(s) to which the defendant is pleading guilty is unconstitutional, and (3) a claim that the admitted conduct does not fall within the scope of the statute." Id. In other words, if you or your counsel discover after you have pled guilty that the statute you pled to is unconstitutional or, at a minimum, does not cover the conduct to which you allocuted, too bad for you: you cannot raise even such elemental defects with the court of appeals.

The agreement then goes on to place similarly broad prohibitions on the defendant's challenging on appeal any sentence that is above the stipulated Guidelines range. See id. Finally, however, tucked into the final two sentences of this endless paragraph is a carve-out enabling a defendant to raise claims of ineffective assistance of counsel on appeal or otherwise. See id. at 6. Years ago, this carve-out was not part of such agreements; it was added because of judicial decisions requiring it. But it is still placed in such an obscure position that the able Assistant United States Attorney in this case, when questioned by the Court at the initial plea hearing, at first believed that no such carve-out existed, see Tr. at 12:3, though she later corrected her error.

In any case, the next few paragraphs of the agreement provide that the defendant is surrendering further rights. Thus, even though a common reason that convictions are later found to be wrongful is the Government's failure to provide exculpatory material pursuant to Brady v. Maryland and its progeny, the plea agreement provides that the defendant waives the right to withdraw his plea or attack his conviction or sentence "on the ground that the Government has failed to produce any discovery material (other than information establishing the factual innocence of the defendant), including Jencks Act material, material pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and impeachment material pursuant to Giglio v. United States, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement." Plea Agreement at 6. This sentence presents the further difficulty of being ambiguously worded, as what is meant by "establishing" the factual innocence of the defendant is not specified.

Because of the concerns highlighted above, the Court, at the initial plea hearing in this case on May 5, 2025, adjourned the ongoing hearing in order to receive briefing on whether the plea agreement contained provisions that were unconstitutional, or, even if not, legally deficient or otherwise unacceptable. The Court is now in receipt of the parties' supplemental briefing. In their respective submissions, both the Government and defendant Montero request that the Court allow Montero's plea proceeding to go forward pursuant to the plea agreement. But each party urges this result for

substantially different reasons. The Government contends that the Court lacks jurisdiction to alter or exclude any provision of the parties' "private contract," but further argues that, even if the Court has jurisdiction, the waivers and other provisions contained in the plea agreement have previously been held to be valid and enforceable. See Gov't Letter at 1, 3-5. Montero, for his part, expresses concern about several of the agreement's terms and about the process of "negotiating" with the Government what he calls a "take-it-or-leave-it plea agreement," see Def. Letter at 1, 4-5, 10, but ultimately asks that the Court accept the plea agreement and permit him to plead guilty so that he might face a five-year, rather than ten-year, mandatory minimum sentence, see id. at 1, 11.

The Government's first argument borders on the frivolous. Specifically, the Government contends that "the enforceability of any particular provision [of the plea agreement] is not yet before the Court" and that "there is no case or controversy relating to the terms of the Plea Agreement, the language it uses, its constitutionality, or any modification of the agreement." Gov't Letter at 3-4; see also Reply Letter from Government, June 26, 2025 ("Gov't Reply") at 1-2.[3]

---

[3] While the Government does not expressly argue that the Court lacks jurisdiction as to the adequacy or legality of the agreement, that is the clear implication of the Government's position. See, e.g., Gov't Letter at 4 (citing case holding that "the exercise of federal jurisdiction under the Constitution depends on the existence of a case or controversy").

The Government's argument, such as it is, ignores the plain language and clear mandate of Federal Rule of Criminal Procedure 11(c)(3) -- entitled "Judicial Consideration of a Plea Agreement" -- which provides that, after the parties have disclosed (as they must under Rule 11(c)(2)) that they have reached a plea bargain agreement, a court "may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Rule 11(c)(5) further provides that if a court rejects the plea agreement, the court must so inform the parties and give the defendant the opportunity to withdraw his plea if it has already been entered. All these provisions plainly contemplate that the Court must undertake an independent evaluation of the parties' plea agreement, regardless of whether the parties themselves have a dispute about its terms.

The Government's alternative argument that the provisions in the plea agreement have previously been held to be valid and enforceable is of much greater weight, but before turning to that argument, the Court examines the defendant's somewhat Janus-like arguments. Montero characterizes the plea agreement he signed with the Government as a "take-it-or-leave it" deal that was his "only way" to avoid the ten-year mandatory minimum sentence he would have faced under the charges set forth in the Information against him. Def. Letter at 1. Although plea bargain negotiations are typically conducted "off the record" in the prosecutor's office, without any

transcript of what occurs, several circumstances, none of which the Government disputes, bear out Montero's characterization.

First, Montero reports that the Government required him to submit a written mitigation statement before the Government "would consider any plea offer." Id. at 2 (emphasis in original). While Montero was considering the Government's demand, the Government produced only "limited discovery" to his counsel and refused to produce further discovery on account of unspecified "law enforcement sensitivities." Id. Thus, not only did the Government require Montero to provide detailed information about himself as the price of even beginning to discuss a plea, but Montero had to decide whether to submit a mitigation statement without the benefit of potentially relevant information that was in the Government's hands.

Second, after the Government agreed to allow Montero to plead guilty to Counts One and Three, the Government continued refusing to provide discovery materials. See id. Specifically, Montero reports, the Government rejected his request to review such documents as "the laboratory reports establishing the drug weight; photographs of the seized firearms; [and] materials reflecting why Mr. Montero had reason to believe the person receiving the firearms had a prior conviction for a crime of violence, controlled substance offense, or misdemeanor domestic violence or was under a criminal justice sentence . . . or intended to use/dispose of the firearms unlawfully." Id. Accordingly, the Government again deprived Montero of information that could have informed his participation in the

plea discussions, thereby continuing to exploit the Government's superior bargaining power.

Third, the Government rejected each of Montero's proposals to amend the draft plea agreement. According to Montero's counsel, the Government initially denied Montero's request to plead guilty to an offense that does not carry a mandatory minimum sentence. See id. Then, after the May 5, 2025, plea hearing, the Government (a) refused to amend the draft plea agreement to eliminate the paragraph requiring Montero to waive his appellate rights or, alternatively, at least to eliminate the provision barring Montero from challenging his conviction on the basis that the statutes to which he would plead guilty are unconstitutional, see id. at 4; (b) rejected Montero's request to delete the provision requiring him to waive his right to appeal based on the Government's failure to provide Brady material, see id.; and (c) refused to rewrite any portion of the draft plea agreement "to clarify its language," id. Notwithstanding the Government's admissions during the colloquy before this Court that it was "not sure" about the operation of various provisions of the plea agreement, see, e.g., Tr. at 12:8-10, the Government thereafter "refused" to "change even a sentence," Def. Letter at 5.

Tellingly, the Government does not contradict Montero's representations about the plea negotiations. See generally Gov't Letter; Gov't Reply. The Government instead falls back on two propositions that are, at minimum, in tension with each other. On the one hand, the Government characterizes the plea agreement as a

14

"private contract" between the parties in the formation of which Montero held at least one "bargaining chip." Gov't Letter at 1-2. On the other hand, the Government insists that it "has no obligation to extend any plea offer, let alone one that reduces the statutory mandatory minimum sentencing exposure." See Gov't Reply at 2. In view of the Government's silence about Montero's allegations that it gave no ground in the parties' supposed "bargaining," the Court has no difficulty in agreeing with Montero that the choice the Government gave him was to take or leave the plea agreement exactly as the Government had drafted it. As mentioned previously, this is further corroborated by the Court's own observation that the plea agreement is a form agreement that the Government employs in nearly every case.

So wedded is the Government to its boilerplate agreement, and so determined to use its power to try to mandate its acceptance, that the Government threatens that "[i]f the Court ultimately rules that it will modify or declare unenforceable any term of the parties' negotiated Plea Agreement before accepting the defendant's guilty plea, . . . the Government respectfully reserves its right to withdraw the Plea Agreement." Gov't Letter at 5 n.4. The Government also cautions that "[t]o the extent the Court requires the Government to provide further pre-indictment discovery," the

Government again "respectfully reserves its right to withdraw the plea agreement." Gov't Reply at 3 n.4.[4]

In view of the Government's conduct toward Montero, the Government's implied threats to the Court, and the Court's experience in numerous similar cases, the Court agrees with Montero that "in this district, as in many others, the term 'bargaining' is a misnomer" where "[p]lea agreements are boilerplate, and, for the most part, defendants cannot negotiate individual terms, or else they run the risk of rejecting the deal and going to trial." Def. Letter at 3-4 (quoting, in part, Susan R. Klein et al., Waiving the Criminal Justice System: An Empirical and Constitutional Analysis, 52 Am. Crim. L. Rev. 73, 75 (2015), and collecting other authorities). As district courts across the country have observed, "[p]lea agreements typically contain boilerplate terms which are not negotiated." E.g., Chua, 349 F. Supp. 3d at 218. Indeed, as District Judge Charles R. Breyer has stated: "[P]lea agreements are contracts of adhesion. The Government offers the defendant a deal, and the defendant can take it or leave it. If he leaves it, he does so at his peril. . . . That Faustian choice is not really a choice at all for a man in the defendant's shoes." Osorto, 445 F. Supp. 3d at 109-

---

[4] The Government's second reservation perplexes the Court because, in the immediately previous footnote of the Government's reply letter, it offers to make "additional discovery materials," including audio and video recordings of some of Montero's alleged criminal conduct, "available for inspection by defense counsel on an Attorney's Eyes Only basis upon defense counsel's agreement to such terms." See Gov't Reply at 3 n.3.

10.  What makes this bludgeon-like exercise of prosecutorial power even more troubling is that, as the Supreme Court has acknowledged, plea bargaining is no longer "some adjunct to the criminal justice system; it is the criminal justice system." Missouri v. Frye, 566 U.S. 134, 144 (2012) (emphasis in original).

It would be bad enough had the Government only wielded its asymmetrical bargaining power to preclude defendants like Montero from meaningful participation in plea negotiations as the price of avoiding the mandatory minimum sentences that Congress has increasingly attached to criminal conduct.[5] But it is far worse, in such a potentially coercive setting, that the Government, not content with the fact that any defendant who is prepared to plead guilty is agreeing to save the Government from having to prove its case and is further agreeing to give up a slew of basic rights such as the right to a trial by his peers, also requires a defendant like Montero to accept terms that sweepingly waive still other basic rights under the Constitution and federal statutes.

---

[5] To the extent that some federal prosecutors were formerly willing to initially charge defendants with offenses that do not carry otherwise available mandatory minimum terms of imprisonment, the leadership of the Department of Justice has recently taken that discretion out of their hands. See Memorandum from Emil Bove, Acting Deputy Attorney General, to All Department of Justice Employees, at 2 (Jan. 21, 2025) (requiring that, "in the absence of unusual facts, prosecutorial discretion at the Department of Justice and the U.S. Attorney's Office is bounded by the core principle that prosecutors should charge and pursue the most serious, readily provable offenses," specifically, offenses "punishable by death where applicable, and offenses with the most significant mandatory minimum sentences . . . and the most substantial recommendation under the Sentencing Guidelines").

The Court highlights just a few such provisions in Montero's plea agreement. Chiefly, as previously noted, the long paragraph concerning Montero's appellate rights requires him to waive his right to appeal or collaterally attack his conviction and sentence in virtually every situation that might be contemplated -- even including where the statutes to which he pleaded are later found to be unconstitutional or where the conduct to which he admitted is later found to be outside the reach of those statutes. See Plea Agreement at 5-6. In other words, under the Government's plea agreement, Montero must waive his ability to appeal or collaterally attack his conviction or sentence even in the event that the Supreme Court later decides that no one else who did what he did could constitutionally be prosecuted under the same statutes. Indeed, the agreement prohibits Montero from arguing, even in the face of intervening developments in the law, that any conduct to which he admitted was never illegal in the first place.

The paragraph does not stop there. It goes on to provide that "any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation." Id. at 5. This language appears to contemplate that, to the extent there are any grounds for an appeal or collateral attack left after the previous sentences have done their work, such an appeal or collateral attack would be limited to any portion of Montero's sentence that the Court might impose in excess

18

of the parties' stipulated Guidelines range. But, at the plea hearing, the Government was just not sure. See Tr. at 15:22-23 ("That is my understanding, but I think it depends on what the basis is for -- I think that's right."). Then, the paragraph provides that "this waiver" applies "regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case." Plea Agreement at 5. This provision appears to contemplate that Montero's "waiver" (a term which the paragraph does not define and which could apply to any, or all, of five sentences preceding it) bars him from bringing an appeal or collateral attack regardless of how the Court's sentence might interact with any other term of imprisonment that might have been imposed in connection with any other proceeding.

Next, as previously noted, a separate paragraph requires Montero to waive his right to appeal or collaterally attack his conviction or sentence on the basis that the Government withheld "any discovery material (other than information establishing the factual innocence of the defendant), including Jencks Act material, material pursuant to Brady v. Maryland, and impeachment material pursuant to Giglio v. United States, that has not already been produced as of the date of the signing of this Agreement." Plea

Agreement at 6 (citations omitted).[6] This provision generally bars
Montero from challenging his conviction or sentence should it come
to light that the Government had, but did not timely produce,
exculpatory evidence or evidence affecting the credibility of a
potential witness. While the provision carves out claims based on
"information establishing the factual innocence of the defendant,"
id., these words are ambiguous on their face. For instance, if the
Government were later to discover that it had DNA evidence showing
that someone other than Montero possessed the firearms at issue in
this case, would that count as "information establishing" Montero's
factual innocence? At the plea hearing, the Government was again not
sure. Tr. at 22:12-14 ("I don't know that I can comment . . .
whether that would fall within this particular provision or not.").
And if the Government itself is not certain as to the meaning or
scope of terms in the agreement -- but adamantly refuses to change
or clarify its language in any respect -- how can a defendant with a
tenth-grade education, even if advised by counsel, be expected to
understand the scope of what it is that he is giving up by this
waiver?

    Finally, a handful of provisions in the plea agreement give the

---

[6] At the May 5, 2025, plea hearing, the Government represented that
it has not withheld any material to be produced pursuant to Brady or
Giglio. Tr. at 21:13-18; see also Def. Letter at 10. But this
provision of Montero's plea agreement purports to bar him from
appealing or collaterally attacking his conviction or sentence
should the Government's representation turn out to be in any way
inaccurate.

Government total discretion as to whether Montero has demonstrated "acceptance of responsibility" for his criminal conduct. See Plea Agreement at 3 (providing that Montero's acceptance of responsibility must be "to the satisfaction of the Government") and 4 (similar). Although the agreement states, as it must, that sentencing decisions are ultimately the Court's, see id. at 5, the discretion that the plea agreement unilaterally reposes in the Government creates yet another asymmetry between the Government and Montero. Should Montero, at any point during his "allocution and subsequent conduct prior to the imposition of sentence," act in some way that the Government determines somehow fails to show that he has accepted responsibility, the agreement permits the Government to move for as much as a three-level increase in Montero's offense level under the Sentencing Guidelines. See id. at 3-4.

In short, the Court largely agrees with Montero that the record before the Court indicates that the Government presented Montero (and the Court) with a boilerplate agreement and refused to negotiate meaningfully about its terms, and that those terms require Montero to trade rights well beyond those required of any guilty plea in order to avoid a ten-year mandatory minimum sentence. Moreover, many of the terms contain patent ambiguities that even Government counsel could not satisfactorily explain.

But all that said, the Court is nonetheless obliged to agree with the Government's fallback argument that agreements such as Montero's have generally been upheld and enforced by the United

States Court of Appeals for the Second Circuit, whose rulings are binding on this Court. In the Second Circuit, for example, broad waivers of the right to appeal of the kind set forth in the instant plea agreements have long been held "presumptively enforceable." See Cook v. United States, 84 F.4th 118, 122 (2d Cir. 2023); United States v. Burden, 860 F.3d 45, 51 (2d Cir. 2017); Sanford v. United States, 841 F.3d 578, 580 (2d Cir. 2016); United States v. Gomez-Perez, 215 F.3d 315, 318 (2d Cir. 2000). According to the Circuit, broad waivers of even "elemental constitutional and statutory rights" are simply "a bargaining chip in the hands of defendants" as they negotiate a reduction of charges with the Government. United States v. Riggi, 649 F.3d 143, 148-49 (2d Cir. 2011). Even though the Circuit has recognized that "plea agreements are not ordinary contracts," Lajeunesse, 85 F.4th at 692, and that they carry "special due process concerns for fairness and the adequacy of procedural safeguards," United States v. Granik, 386 F.3d 404, 413 (2d Cir. 2004) (cleaned up), yet in case after case the Circuit has chosen to enforce such agreements.

Take Cook v. United States, decided less than two years ago. Six petitioners brought habeas petitions under 28 U.S.C. § 2255, arguing that recent Supreme Court decisions that struck down provisions of the Armed Career Criminal Act ("ACCA") meant that petitioners' convictions for conspiracy to commit Hobbs Act robbery could no longer serve as a basis for their ACCA convictions. See 84 F.4th at 121. All six petitioners had executed appeal and collateral

attack waivers like Montero's, and on that basis, the district court denied their petitions without reaching their arguments on the merits. See id. The Circuit affirmed, holding that petitioners' waivers were part of their bargain with the Government, and "we are not free to disturb the bargain the parties strike." Id. at 124-25. Over the dissent of three judges, the Circuit denied rehearing en banc. See Cook v. United States, 111 F.4th 237 (2d Cir. 2024). Six judges stressed that petitioners' waivers were "the product of a bargain" that included giving-up "as-yet-unknown meritorious defenses and assertions of error." Id. at 240 (Sullivan, J., concurring in denial of rehearing en banc). These judges emphasized that a defendant who enters into a waiver intentionally "forgoes any potential benefit from a subsequent change in law," and the fact that such a decision "sometimes turns out to be improvident . . . does not mean that the waiver was unknowing." Id.

In Cook and other such cases, the Circuit has recognized only a few, narrow exceptions to the enforceability of appeal and collateral attack waivers, such as when a prison sentence is based on constitutionally impermissible factors or the government breaches a plea agreement. See Cook, 84 F.4th at 122.[7] But for all its

_____

[7] While the Circuit has also left open, in dicta, the possibility that such a waiver could be unenforceable "in the event of a 'complete miscarriage of justice,'" specifically, in the event that changes in the law result in a defendant's having been convicted of "an act that the law d[id] not make criminal," id. at 125 n.4, the Circuit has not actually held that such a "miscarriage of justice" exception exists, see id. The Circuits that have recognized that exception have construed it narrowly by, for instance, limiting it

unfairness, Montero's plea agreement does not fall, at least facially, into any of the exceptions to the validity of appellate and collateral attack waivers that the Circuit has thus far recognized.

Furthermore, the Court cannot overlook Montero's own determination to proceed with his plea bargain. As his counsel's letter to the Court makes clear, Montero appreciates the nature of the bind the Government has placed him in, but he still wishes to move forward with the entry of a guilty plea pursuant to the agreement. See Def. Letter at 1 ("Mr. Montero would like to plead guilty and accept responsibility for his actions. But he also needs the ability to advocate for and try to receive a sentence of less than ten years in prison. Unfortunately, the government's take-it-or-leave-it plea agreement appears to be the only way for him to accomplish this."). Given this, and given that binding decisions of the Second Circuit appear to preclude the Court from holding the plea agreement unenforceable on the grounds here stated, the Court, reluctantly, directs the parties to appear in court on July 30, 2025 at 11 a.m., to resume the plea proceeding.

---

to circumstances where a defendant has a "cognizable claim of actual innocence." E.g., United States v. McKinney, 60 F.4th 188, 192 (4th Cir. 2023); cf. United States v. Litos, 847 F.3d 906, 910-11 (7th Cir. 2017) (collecting cases).

In addition, the Clerk of Court is respectfully directed to docket the parties' letters of May 19, 2025; June 9, 2025; and June 26, 2025.

SO ORDERED.

Dated:    New York, NY
          July 21 , 2025                    _____
                                            JED S. RAKOFF, U.S.D.J.