


**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10287*

December 10, 2025

**BY ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

> Re:    ***United States v. Carlos Manuel Zapata**, 25 Cr. 201 (JSR)*

Dear Judge Rakoff:

The Government respectfully submits this letter in advance of defendant Carlos Manuel Zapata's sentencing in the above-captioned case, which is scheduled for December 17, 2025. On August 8, 2025, the defendant pleaded guilty to (i) one count of conspiring to distribute at least 40 grams of fentanyl, in violation of 21 U.S.C. § 846, and (ii) one count of conspiring to traffic firearms, in violation of 18 U.S.C. § 933(a)(3). For the reasons explained below, the Government submits that a sentence of at least 84 months' imprisonment, followed by a four-year term of supervised release, including all special conditions recommended by the Probation Office, is sufficient, but not greater than necessary, to account for the factors set forth in Title 18, United States Code, Section 3553(a). The Government's requested sentence is above the 60-month statutory mandatory minimum sentence, and within the parties' stipulated United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 78 to 97 months' imprisonment. The Probation Office has recommended a sentence of 60 months' imprisonment.

## I.    Offense Conduct

The instant case arises out of the defendant's sale, between approximately June and September 2024, of a total of nine firearms and approximately 43 grams of fentanyl to two separate undercover law enforcement officers over the course of six transactions. Each of the six transactions was audio and video recorded and is described below.

### A.  June 3, 2024 Transaction

On June 3, 2024, in the Bronx, NY, an undercover officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("UC-1") met with Zapata and one other individual ("CC-1") in-person. (Presentence Investigation Report ("PSR") ¶ 9). Although the transaction initially began with Zapata entering UC-1's car, both Zapata and UC-1 later exited the vehicle and entered a residential building at which Zapata resided ("Zapata's Apartment Building"), where they met CC-

1. (*Id.*). During the transaction, Zapata handed a Polymer 80 firearm[1] and approximately 14 fentanyl pills weighing approximately 1.756 grams to UC-1, and in exchange, UC-1 paid a total of $1,400, consisting of $1,100 for the firearm and $300 for the pills. (*Id.*). UC-1 and CC-1 discussed the ammunition and magazine for the firearm that UC-1 purchased. Subsequent laboratory testing showed that the pills Zapata sold to UC-1 tested positive for fentanyl. (*Id.*).

In the period leading up to the June 3, 2024, transaction, UC-1 had a telephone call with Zapata, in which UC-1 stated that he was interested in "fetty" (referring to fentanyl). (PSR ¶ 10). Zapata responded by saying that while it "was not [his] lane," he could find someone to assist. (*Id.*). Subsequently, during the June 3, 2024, transaction, after Zapata entered UC-1's car, Zapata handed UC-1 a Ziploc bag containing 14 blue M30 fentanyl pills, two of which were darker and discolored. (*Id.*). Zapata stated that the two discolored pills came from a different supplier than the other 12 pills and asked UC-1 to "check the two pills out"—meaning UC-1 should see if those pills were good and could be resold. (*Id.*). UC-1 responded that he would pass the pills to a particular user to try them. Zapata asked UC-1 about pricing in the event UC-1 could sell those pills. (*Id.*). UC-1 told Zapata that if the pills sold, UC-1 and Zapata could make a deal to sell pills together. (*Id.*). Zapata indicated that he could acquire 30 M30 pills per month from the supplier of the 12 M30 pills. (*Id.*).

In addition, during the June 3, 2024, transaction, UC-1 and Zapata discussed firearms. (PSR ¶ 11). UC-1 explained that if Zapata could promise UC-1 three guns, UC-1 would be informing others that UC-1 would be acquiring three guns—meaning UC-1 was dealing with and answering to other people. (*Id.*). UC-1 informed Zapata that UC-1 would transport the guns provided by Zapata to New Jersey in order to sell them and that UC-1 would drive from New Jersey to meet Zapata. (*Id.*). UC-1 then asked Zapata for switches (referring to firearm switches, which convert a semi-automatic firearm into a fully automatic firearm). (*Id.*). Zapata stated that he was expecting to acquire some from another person. (*Id.*). UC-1 commented that switches routinely sold and that UC-1 took those back to New Jersey to sell, thereby easily making his money back. (*Id.*). Zapata mentioned "ghosts" (referring to untraceable, privately manufactured ghost guns), and UC-1 stated that he would purchase those too—because if the weapons were able to shoot and kill, they make money. (*Id.*). UC-1 also stated that he had the clientele that would be interested in such weapons. UC-1 and Zapata then discussed "dirty" guns, meaning guns that had been used in a crime. (*Id.*). UC-1 informed Zapata that he did not care if the guns were dirty, indicating that he could still make money from them. (*Id.*). Zapata also shared information about his firearms suppliers, including by, for example, reporting that one supplier stored the gun in a mechanic shop. (*Id.*).

As UC-1 and Zapata were in UC-1's car waiting to obtain the Polymer 80 firearm, Zapata asked UC-1 if he wanted to purchase crack cocaine. (PSR ¶ 12). Zapata then retrieved a clear bag containing suspected crack cocaine from his shorts and handed it to UC-1. (*Id.*). UC-1 placed it on a scale, which read approximately six grams. (*Id.*). UC-1 then handed the bag back to Zapata, who placed it back inside his shorts. (*Id.*). Shortly thereafter, Zapata called another person, who directed Zapata to come and obtain the firearm, which would be sold at the price of $1,100. UC-1 paid

---

[1] A Polymer 80 firearm is a type of firearm that is privately made and does not include a serial number, which allows the firearm to be untraceable by law enforcement.

Zapata for the 14 pills; UC-1 and Zapata then exited UC-1's vehicle, walked to Zapata's Apartment Building, and entered into the basement where they met CC-1. (*Id.*). Zapata handed the Polymer 80 firearm to UC-1 and then directed UC-1 to pay CC-1 $1,100 for it, which UC-1 did. UC-1 and Zapata then exited the building. (*Id.*).

### B. June 11, 2024 Transaction

On June 11, 2024, in the Bronx, NY, UC-1 met Zapata in person and purchased the following from Zapata: (i) a 9-millimeter Sig Sauer P365 XL firearm with serial number 66B067692 for approximately $1,300; and (ii) approximately 21 fentanyl pills weighing approximately 2.633 grams for approximately $600. (PSR ¶ 13). Subsequent laboratory testing showed that the pills Zapata sold to UC-1 tested positive for fentanyl. (*Id.*). Additionally, the Sig Sauer firearm that Zapata sold to UC-1 had been reported stolen in 2020 to the Sanford Police Department in North Carolina. (*Id.*).

Prior to the June 11, 2024 transaction, UC-1 and Zapata engaged in several communications. (PSR ¶ 14). Specifically, on June 8, 2024, UC-1 received a FaceTime call from Zapata, during which Zapata appeared to be inside of a residence and showed UC-1 that Zapata had what appeared to be suspected fentanyl in the form of blue M30 pills. (*Id.*). Zapata advised UC-1 he was in possession of more of the same pills he had sold UC-1 on June 3, 2024. (*Id.*). Zapata also told UC-1 that he acquired the pills from the same older female from whom he acquired the previous pills he sold to UC-1. (*Id.*). Additionally, the following day, on June 9, 2024, Zapata texted UC-1 via WhatsApp a picture of a firearm from the website www.fleetfarm.com, and he advised UC-1 to call him. (*Id.*). At approximately 8:21 pm on June 9, 2024, Zapata texted UC-1 a photograph of a firearm with an extended high-capacity magazine. (*Id.*). UC-1 then called Zapata via FaceTime and Zapata showed UC-1 a Sig Sauer P365 firearm with an optic attached and a high-capacity magazine, and he told UC-1 that he would clean the rust off the firearm. (*Id.*). Zapata informed UC-1 that he would also have two more firearms in his possession for sale by June 10, 2024, and UC-1 responded by asking to instead meet on June 11, 2024. (*Id.*). Zapata agreed and told UC-1 that, by then, he would have at least three firearms for sale for UC-1, plus fentanyl pills. (*Id.*).

During the June 11, 2024, transaction, Zapata first met with UC-1 in UC-1's parked car. (PSR ¶ 15). Inside the car, Zapata handed UC-1 a black plastic bag containing the nine-millimeter Sig Sauer P365 XL firearm and magazine. (*Id.*). UC-1 asked Zapata if he had "dog food," which is a common slang word for ammunition. (*Id.*). Zapata said he did not bring any ammunition with him to the car but had some in his house. (*Id.*). Zapata asked UC-1 if he wanted to accompany Zapata to his house, where Zapata could acquire the ammunition, as it was in the vicinity, but UC-1 declined the invite. (*Id.*).

While inside UC-1's car, Zapata also handed UC-1 a Ziploc bag with approximately 21 fentanyl pills, then exited UC-1's car to go retrieve ammunition from his home. (PSR ¶ 16). Zapata then re-entered the car approximately three minutes later, Zapata showed UC-1 several boxes of assorted ammunition (including a box of .45-caliber ammunition, a box of .38-caliber ammunition, and a box of nine-millimeter ammunition), and told UC-1 that Zapata acquires one box of ammunition for "fifty," meaning $50. (*Id.*). When back in the car, Zapata placed several calls to an individual who had the other firearms for UC-1 (since, on June 9, 2024, Zapata had promised

UC-1 three firearms), but that individual did not answer the telephone. (*Id.*). UC-1 told Zapata that he would not wait for the other firearms, but that he would purchase the one Zapata had brought with him. (*Id.*).

Zapata and UC-1 also discussed narcotics during the June 11, 2024 transaction. (PSR ¶ 17). UC-1 told Zapata that the pills from the previous transaction sold well and asked for the same supply of pills during their next meeting. (*Id.*). Zapata confirmed that the drugs would be obtained from the same supplier. (*Id.*). Zapata also asked about the two discolored pills from the June 3, 2024 transaction, and UC-1 said they were fine. (*Id.*). Zapata offered to sell UC-1 more fentanyl pills from two sources: (i) from an individual UC-1 encountered during the June 3, 2024 transaction, who had sold Zapata the two discolored blue fentanyl pills that Zapata then sold to UC-1 on June 3, 2024; and (ii) from another woman who had supplied Zapata with 12 blue fentanyl pills that Zapata then sold to UC-1 during the June 3, 2024 transaction. (*Id.*). UC-1 said he would buy from whichever supplier gave him a better deal. (*Id.*). UC-1 also inquired about the price for "cook up," which is a commonly used code word for crack cocaine. (*Id.*). Zapata said he would charge UC-1 $30 per gram of crack cocaine that UC-1 wanted. (*Id.*).

When UC-1 inquired about the price of the nine-millimeter Sig Sauer P365 XL firearm that Zapata had provided him, Zapata responded that his associate wanted "twelve," meaning $1,200. (PSR ¶ 18). UC-1 then paid Zapata $1,300 for the firearm and 33 rounds of ammunition, as well as $600 for the fentanyl pills. (*Id.*).

### C. June 25, 2024 Transaction

On June 25, 2024, in the Bronx, NY, UC-1 and an undercover officer working for the New York City Police Department ("UC-2") met Zapata in person and purchased the following from him: (i) a nine-millimeter Taurus G3 firearm with serial number ABE580213 for approximately $1,300; (ii) a .380-caliber Jimenez Arms J.A. firearm with a partially defaced serial number for approximately $1,100;[2] and (iii) approximately 136 fentanyl pills and powder weighing approximately 17.341 grams for approximately $3,500.[3] (PSR ¶ 19). During the course of the transaction, Zapata stated, among other things, that he obtained the firearm from CC-1, who was nearby. (*Id.*). Subsequent laboratory testing showed that the pills Zapata sold to UC-1 tested positive for fentanyl. (*Id.*). Additionally, the Taurus firearm Zapata sold to UC-1 and UC-2 had been reported stolen in 2020. (*Id.*).

Prior to the June 25, 2024, transaction, Zapata texted UC-1 a photograph of one firearm on June 23, 2024, and a photograph of another firearm on June 24, 2024. (PSR ¶ 20). After the text on June 24, 2024, Zapata called UC-1 on FaceTime to confirm that Zapata possessed the firearms depicted in the texts. (*Id.*). Zapata then told UC-1 that he would have four firearms available for UC-1 to purchase during the next transaction. (*Id.*). Zapata also stated that he had 136 fentanyl pills and asked if UC-1 was interested in purchasing all of them. (*Id.*). UC-1 told Zapata that his

---

[2] After acquiring the firearm, law enforcement lab technicians were able to restore a partial serial number of "314_98."

[3] During this meeting, UC-2 paid only $1,500 for the fentanyl pills and agreed with Zapata that UC-2 would owe the remaining $2,000 as part of the next transaction.

associate ("UC-2"), would come with UC-1 to the next transaction and that UC-2 was interested in fentanyl powder. (*Id.*). Zapata assured UC-1 that he would acquire a sample of fentanyl powder to supply to UC-2. (*Id.*).

During the June 25, 2024 transaction, Zapata first met with UC-1 inside UC-1's car. (PSR ¶ 21). UC-1 introduced Zapata to UC-2, and then Zapata handed UC-2 a clear plastic bag containing a sample of blue powder at no cost. (*Id.*). Zapata showed UC-1 and UC-2 a clear plastic bag containing 36 fentanyl pills, as well as a pill bottle containing 100 fentanyl pills, and UC-1 stated that he would purchase the 36 fentanyl pills. (*Id.*).

Next, Zapata showed UC-1 and UC-2 the .380-caliber Jimenez Arms J.A. firearm and magazine, and asked UC-1 for the agreed-upon amount of money so that Zapata could pay the supplier of the firearm. (PSR ¶ 22). Zapata assured UC-1 that the second firearm that UC-1 wanted was en route. (*Id.*). Zapata then exited the vehicle and returned with a nine-millimeter Taurus G3 firearm and magazine. (*Id.*). Zapata indicated that a third firearm that he and UC-1 had previously discussed was already sold. (*Id.*). Zapata also spoke to UC-1 about a fourth firearm that Zapata tried to acquire from someone for $800, but he stated that the person was not answering the telephone. (*Id.*). Zapata and UC-1 then spoke more about the owner of the firearms. (*Id.*). Additionally, Zapata stated that the supplier was CC-1, the individual who had participated in the June 3, 2024 transaction. (*Id.*).

Zapata then asked UC-1 if he wanted the additional 100 fentanyl pills that Zapata had showed UC-1. (PSR ¶ 23). Zapata stated that he had been holding onto the pills since UC-1 had asked for them. (*Id.*). Zapata then pointed outside the car to an individual standing under a building awning, whom he said was the individual who brought Zapata the pills "consistently." (*Id.*). UC-1 then agreed to purchase the additional 100 fentanyl pills. (*Id.*). At that time, Zapata told UC-1 to roll down his car window, and CC-1 came over to the car and greeted UC-1 and UC-2, and he then walked away. (*Id.*). Zapata and UC-2 engaged in a further discussion about narcotics, and Zapata told UC-2 that the price for fentanyl powder was $35 per gram, which was the price Zapata was given by his supplier. (*Id.*). Zapata indicated that, since he was offering fentanyl powder at the same price for which he was buying it, Zapata would not make any profit from the sale of the powder. (*Id.*). Zapata pointed to UC-1 and stated that he dealt with the pills (as in, the fentanyl pills Zapata had been selling to UC-1). (*Id.*). Zapata also said that he only dealt with the "hard and the soft," which are commonly used code words for crack cocaine and powder cocaine, respectively. (*Id.*).

### D.  July 11, 2024 Transaction

On July 11, 2024, in the Bronx, NY, UC-2 met Zapata in person and purchased a nine-millimeter Taurus G2C firearm with serial number ADE383537 for approximately $1,350. (PSR ¶ 24). Prior to the July 11, 2024, transaction, UC-2 spoke with Zapata about purchasing two or three firearms and 10 grams of fentanyl powder from Zapata. (*Id.*). Subsequently, during the July 11, 2024 transaction, Zapata entered UC-2's car, handed UC-2 the nine-millimeter Taurus G2C firearm, and told UC-2 that another firearm (namely, a "forty," meaning .40-caliber handgun) would arrive soon. (*Id.*). When UC-2 asked about the fentanyl powder, Zapata explained that he was trying to acquire it for UC-2. (*Id.*).

At that time, Zapata showed UC-2 his telephone, on which Zapata was communicating with a potential supplier. (PSR ¶ 25). UC-2 paid for the nine-millimeter Taurus G2C firearm and told Zapata that he was going to leave. (*Id.*). In response, Zapata reiterated that he was trying to acquire the powder UC-2 wanted, but "that was not [his] lane." (*Id.*). Zapata explained that he typically dealt with "soft," meaning powder cocaine, and crack, but that he was still trying to make sure his customers are satisfied and obtained what they wanted. (*Id.*). In this instance, Zapata was trying to acquire for UC-2 the additional firearms and fentanyl powder that UC-2 wanted. (*Id.*). UC-2 told Zapata that going forward, Zapata should have the goods he is trying to sell to UC-2 on hand before meeting with him. (*Id.*).

### E.  August 15, 2024 Transaction

On August 15, 2024, in the Bronx, NY, UC-1 purchased the following from Zapata: (i) a nine-millimeter SCCY CPX-1 firearm with serial number 222289 for approximately $1,200; (ii) two privately made firearms for approximately $1,200 each; and (iii) approximately 191 fentanyl pills weighing approximately 21.333 grams for approximately $950. (PSR ¶ 26). During the course of the transaction, after Zapata handed UC-1 a black plastic bag containing the two privately made firearms, UC-1 asked about the guns. (*Id.*). Zapata confirmed they were ghost guns but that he did not know who made them. (*Id.*). UC-1 checked them and stated that he did not want them to break because the 3D-printer sometimes messed them up. (*Id.*). Zapata then handed the SCCY CPX-1 firearm to UC-1. (*Id.*).

UC-1 then asked about the pills and after some discussion, Zapata informed that the brother of CC-1 was bringing the pills. (PSR ¶ 27). UC-1 and Zapata then discussed pricing for the pills and guns. (*Id.*). Due to the fact that there was a larger number of pills sold in the transaction, UC-1 told Zapata not to rush him, and that Zapata would have to wait until UC-1 sold all of them before UC-1 returned to Zapata for more pills. (*Id.*). A few minutes later, Zapata exited UC-1's vehicle to obtain the pills from another male, and then Zapata re-entered UC-1's car and provided the pills in a Tylenol bottle to UC-1. (*Id.*). Zapata and UC-1 then had additional discussions about prices and Zapata's suppliers and UC-1 expressed interest in purchasing additional firearms within certain price ranges. (*Id.*). Subsequent laboratory testing showed that the pills Zapata sold to UC-1 tested positive for fentanyl. (*Id.*). Additionally, the SCCY firearm sold by Zapata was reported to law enforcement as stolen in 2016. (*Id.*).

### F.  September 9, 2024 Transaction

On September 9, 2024, in New York, NY, UC-1 purchased from Zapata a nine-millimeter Glock 43 firearm with serial number BDRW816, which was loaded with six rounds, for approximately $1,370.[4] (PSR ¶ 28). The Glock 43 firearm sold by Zapata was reported to law enforcement as stolen in 2019. (*Id.*). The meeting location for this transaction was different than the other transactions, and when Zapata entered UC-1's vehicle at the meeting location, Zapata stated that the area was known for "percs," referring to Percocet pills. (*Id.*). In Zapata's previous communications with UC-1 and UC-2 discussing the M30 pills being purchased from Zapata,

---

[4] UC-1 and Zapata agreed upon a price of $1,350 for the firearm, but then Zapata asked for another $20 to cover the cab ride to their meeting, which UC-1 provided.

Zapata never referred to the pills as "percs." During the September 9, 2024 transaction, UC-1 raised with Zapata the fact that the M30 pills Zapata sold him in the prior August 25, 2024 transaction had been wet, which was not acceptable to UC-1. (*Id.*). Zapata stated that the supplier lived in the basement, which could be humid. (*Id.*). UC-1 explained that the pills were off color because they had been wet and that UC-1 did not make money on the pills as a result. (*Id.*). UC-1 and Zapata talked about the supplier and prices the supplier wanted. (*Id.*). Later in the conversation, UC-1 stated that he travels back and forth from New Jersey; is taking on all the risk in his dealings with Zapata; and that prices are high, but that nevertheless, UC-1 continued with the arrangement because UC-1 and Zapata had a good relationship. (*Id.*). UC-1 and Zapata had further discussions about the pill supplier who provided wet pills and what the price should be to that supplier. (*Id.*). Separately, during the September 9, 2024, transaction, Zapata received a telephone call on speaker and appeared to be brokering or discussing a potential firearms sale and prices with another individual. (*Id.*).

## II.    Procedural History

On December 4, 2024, Zapata was charged by criminal complaint with four counts: (i) conspiring to distribute narcotics, namely, fentanyl, in violation of 21 U.S.C. § 846 ("Count One"); (ii) use, carrying, and possession of firearms in connection with a narcotics trafficking conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(i) ("Count Two"); (iii) firearms trafficking conspiracy, in violation of 18 U.S.C. § 933(a)(3) ("Count Three"); and (iv) firearms trafficking, in violation of 18 U.S.C. § 933(a)(1) ("Count Four") (the "Complaint"). *See* Dkt. 1. He was arrested that same day and presented the following day, on December 5, 2024, before the Honorable Henry Ricardo, United States Magistrate Judge, and ordered released on conditions. *See* Dkt. 4.

At a change of plea hearing on May 5, 2025, Zapata consented to the filing of a three-count information charging him with Counts One through Three of the Complaint (the "Information"). *See* Dkt. 24. However, under the parties' plea agreement, he agreed to plead guilty only to Counts One and Three. At the May 5, 2025 proceeding, the Court ordered the parties to brief certain legal issues relating to the plea agreement, and there was no change of plea at that time. After the court issued an order on July 21, 2025 addressing the legal issues the parties had briefed, *see* Dkt. 33, the parties appeared on July 30, 2025, to resume the plea proceeding, which resulted in the Court ordering additional briefing relating to the requisite *mens rea* for the narcotics offense. Ultimately, on August 8, 2025, Zapata pled guilty pursuant to the plea agreement to Counts One and Three of the Information, and the Court scheduled sentencing for December 17, 2025. Under the plea agreement, the parties stipulated to a Guidelines calculation of 78 to 97 months' imprisonment, including a 60-month statutory mandatory minimum (the "Guidelines Range"), which is consistent with the Probation Office's calculation.

## III.    Discussion

### A. Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. 220, 264 (2005). Because

they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 46, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)–(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. A Sentence of At Least 84 Months' Imprisonment is Warranted

The Government respectfully submits that a sentence of at least 84 months' imprisonment, followed by four years of supervised release, would be sufficient, but not greater than necessary, to serve the purposes of sentencing.

*First*, a substantial sentence of 84 months' imprisonment or more would appropriately account for the serious nature of the offenses. On six separate occasions spanning a four-month period during the summer of 2024, the defendant sold to undercover officers a total of nine firearms, over 350 fentanyl pills in the form of counterfeit pharmaceutical pills, and loose fentanyl powder. Of the nine firearms sold by the defendant, three were privately manufactured, untraceable "ghost" guns, three had been previously reported to law enforcement as stolen, one had a partially defaced serial number, and one was loaded. In other words, the conduct that the defendant engaged in – repeatedly without any hesitation whatsoever – was incredibly dangerous and contributes to the gun violence and opioid overdose problems facing New York City. Individuals like the defendant, who illegally traffic in firearms and act with a complete disregard for the danger they create and the lives they put at risk, are the driving force behind the deadly gun violence epidemic plaguing New York City. Because there are no gun manufacturers in New York

City, guns flow into the city and the surrounding communities via gun traffickers, who take advantage of the general lack of access to guns and strict local gun laws by operating an illegal black market selling firearms for quick money, with no regard for the potentially deadly consequences.  That's exactly what the defendant was doing here – selling clearly illegal, dangerous, untraceable, stolen, partially defaced firearms for his own profit.

On top of this, the defendant sold fentanyl pills and powder, with the pills dyed and shaped to resemble pharmaceutical pills.  Fentanyl continues to claim thousands of lives in New York City and across the country.[5]  It has been deemed the single deadliest drug the United States has ever encountered, and drug overdoses remain the leading cause of death for Americans aged 18 to 44 years old.[6]  As little as two milligrams of fentanyl – equivalent to a few grains of salt – can be fatal.[7]  Moreover, the fact that most of the fentanyl sold by the defendant was disguised in the form of counterfeit pills further underscores the dangerousness of his conduct, as users of counterfeit pills laced with fentanyl often have no awareness of whether those pills contain fentanyl, or how much fentanyl, and whether the fentanyl is mixed with other dangerous substances – all of which increases the risk of overdose.

*Second*, a sentence of at least 84-months in prison is needed to deter the defendant and others from future crimes, to promote respect for the law, and to protect the public. The manner in which the defendant carried out his gun and drug trafficking reflects that he is an experienced dealer with no regard for the danger he posed to others.  Despite claiming that fentanyl was not his "lane," he had no difficulty finding not only one, but at least two separate suppliers of M30 fentanyl pills.  The defendant showed up for the first transaction with the undercover officer on June 3, 2024 with pills from both suppliers and stated that he could obtain 30 M30 pills per month from one of the suppliers.  Far from being hesitant, the defendant was eager to expand his drug business to include fentanyl pills.  He had already lined up suppliers, and over the course of several transactions with the undercover officers, provided to them hundreds of M30 fentanyl pills, with the amounts increasing with each transaction.  Moreover, the defendant sold fentanyl in multiple forms – pill and powder – and repeatedly offered the undercover officers other drugs such as powder and crack cocaine at several of the transactions, all of which reflect that he was an established and active drug dealer with a large network of suppliers from whom he could immediately turn to for drugs.

Similarly, the defendant was also a prolific firearms trafficker who had no concern for the danger he was creating for the community.  He sold firearms of many different types to the undercover officers and had multiple different suppliers on hand, as evidenced by the numerous calls he made to his suppliers, often in the presence of the undercover officers.  During the June 3,

---

[5] According to reporting from the Centers for Disease Control ("CDC"), there were over 48,000 reported opioid overdose deaths in the country between April 2024 to April 2025, with the vast majority of those deaths associated with synthetic opioids, which includes fentanyl. *See* www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

[6]     *See*     https://www.cdc.gov/media/releases/2025/2025-cdc-reports-decline-in-us-drug-overdose-deaths.html; https://www.dea.gov/resources/fentanyl-supply-chain.

[7] *See* https://nida.nih.gov/research-topics/fentanyl#dangerous.

2024 transaction, the defendant expressed that he was expecting to obtain firearm switches, which are incredibly dangerous devices that convert a semiautomatic firearm to a fully automatic firearm capable for firing multiple rounds continuously with a single pull of the trigger. The defendant explicitly asked the undercover officer about ghost guns and "dirty" guns, referring to guns that had been used in crimes. The officer responded that he would take both types, that as long as they "shoot and kill," they make money. Thus, the defendant was fully aware of the dangerous nature of the weapons he was selling illegally and chose to ignore the risks to others in the name of his own profit. As further indication of his extensive gun trafficking, during the June 11, 2024 transaction, after the defendant handed the undercover officer a firearm (that had been reported to law enforcement as previously stolen), the officer asked for ammunition, and the defendant said he had some at his residence. He then exited the officer's car, went to his residence, and came back with several boxes of ammunition of different calibers to sell to the undercover officer. The fact that he had ample and varied ammunition available on hand for sale also suggests that he was actively engaged in firearms trafficking with others, beyond the transactions he had with the undercover officers in this case.

### IV.    Conclusion

For the reasons set forth above, a sentence of at least 84 months' imprisonment followed by four years of supervised release would be sufficient but not greater than necessary in this case.[8]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    *s/*_____
Katherine Cheng
Diarra M. Guthrie
Assistant United States Attorneys
(212) 637-2492 / -2463
Katherine.Cheng@usdoj.gov
Diarra.Guthrie@usdoj.gov

cc:    Marne Lenox, Esq.

---

[8] The Government agrees with the Probation Office's recommendation that the Court impose three special conditions, including a search condition, participation in an outpatient alcohol and/or drug treatment program, and a financial condition, due to the defendant's history of substance abuse, and the use of his cellphone in connection with the instant offenses, among other factors. Pursuant to recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court imposes, the Court briefly state the reasons that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).