# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

December 10, 2025

**BY ECF**

Hon. Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

RE:     **United States v. Carlos Manuel Montero Zapata**
        **25 Cr. 201 (JSR)**

Dear Judge Rakoff:

When Carlos Montero Zapata first sold a gun he was 25 years old. Months earlier, the ceiling in his family's restaurant collapsed, wreaking financial havoc that resulted in his mother's aborted suicide attempt. From June to September 2024, Mr. Montero sold guns and drugs to an undercover officer in a misguided effort to support his family.

"Carlos has always been very protective of our family," his father shares. Letter of Carlos Manuel Montero, Ex. A. "I believe his actions in this case were driven by the financial pressure we experienced after a failed business venture. We opened a restaurant that was not successful a few years ago and encountered difficulty repaying our bills. Carlos thought he could help us by trying to make money, but over many conversations we've had since his arrest, he understands how wrong that was." *Id.*

Mr. Montero's offenses were relatively short lived, voluntarily abandoned, and did not involve any violence or result in harm to another person. Over the course of his misconduct, Mr. Montero never sold to anyone other than the confidential informant. And he accepted responsibility swiftly. In Mr. Montero's words, "I was feeling desperate. I didn't think it could get worse, but here I am facing a mandatory five-year sentence, where I will be even less able to provide for my family." Letter of Carlos Montero Zapata, Ex. B.

The consequences of Mr. Montero's actions are severe: He will spend the next five years, at minimum, in a federal correctional facility. Before this offense, his most egregious misconduct was a nonviolent misdemeanor conviction for an offense that occurred 7 years ago. He has never before been sentenced to any period of incarceration.

To achieve the aims of sentencing, including punishment and deterrence, we respectfully request that Your Honor sentence Mr. Montero to 60 months' incarceration. This sentence is a substantial one that reflects the seriousness of the offense and is sufficient punishment. *See* 18 U.S.C. § 3553(a).

## I.    Background

### A.    *Carlos Montero Zapata's childhood and adolescence*

Carlos Montero was born 27 years ago in the Dominican Republic. As a young child, he lived with his mother Ediltrudys Zapata, sister Yasmel Montero Zapata, and paternal grandparents in Villa Altagracia, Dominican Republic. Carlos and his sister enjoyed "a close relationship, full of affection, laughter and mutual support." Letter of Yasmel Montero Zapata, Ex. C. "He has always been a loving, sensitive, supportive young man with a big heart." Letter of Ediltrudys Antonia Zapata, Ex. D.

But Carlos's early childhood was marked by instability. In the Dominican Republic, "the government was not providing adequate public services or fixing utilities, which led to rioting and acts of violence by the citizenry." Presentence Report ¶ 63. Carlos vividly recalls an incident when tear gas filled the air as he walked home from school.

Fearing for their safety, Carlos's mother and sister migrated to the United States, where his father had moved when Carlos was just an infant. Carlos was left behind in the Dominican Republic with his grandparents "under poor economic circumstances and in the midst of civil unrest." *Id.* Although "his grandparents owned their home, it was not equipped with working plumbing or electricity." *Id.* Carlos's parents "routinely sent money back to the Dominican Republic" to help, *id.*, but it was never enough.

Over the years spent living with his grandparents, Carlos became "very attached" to his grandfather. Letter of Carlos Manuel Montero, Ex. A. But the separation from his parents and sister "was very hard for him." *Id.* While his parents "always kept in touch and visited him frequently, the distance left a deep imprint on his heart." *Id.* Carlos's sister believes "he probably felt abandoned by us and couldn't process those emotions as a child." Letter of Yasmel Montero Zapata, Ex. C.

Carlos reunited with his parents in the United States, where he later naturalized. In 2005, when he was seven years old, Carlos and his family moved into a two-bedroom apartment in public housing in the Bronx. This was the first time Carlos had lived with his father since he was a newborn. Young Carlos labored to adjust to changing family dynamics, a foreign country and an unfamiliar language.

School in the United States proved challenging. Carlos's parents, monolingual Spanish speakers, couldn't help. Carlos had to repeat both first and fifth grade; in middle school, he received special education services. "He was bullied incessantly at school, and it made him not want to invest in his education because of the torment that came with it." Letter of Carlos Manuel

2

Montero, Ex. A. His confidence plummeted. Having been left back so many times, Carlos's friends were his teachers. "I wasn't a regular student," he admits.

But Carlos did learn his new country's language. As the only fluent English speaker in his home, Carlos served as his family's interpreter and advocate, translating bills and medical records. Shortly after his older sister moved out, Carlos's mother was diagnosed with lupus. He was just 13 years old. Before becoming ill, Ms. Zapata had been a home health attendant. Her condition hampered her work. With his mother's health in decline, Carlos became her aide, assuming the parental role of managing household tasks. He regularly accompanied his mother to doctor's appointments, equal parts son and translator. Ms. Zapata began confiding in Carlos about their family's financial struggles. At 15, Carlos took his first job as a cashier at Wendy's. Presentence Report ¶ 92. The burden of helping to provide for his family proved isolating; Carlos believed no one could truly understand his struggles.

By tenth grade, the pressures of Carlos's environment had become overwhelming. He "isolat[ed] himself" from his family "and spent a lot of time with older friends." Letter of Yasmel Montero Zapata. Because his parents were "constantly working," they had a hard time keeping a close eye on Carlos. Letter of Ediltrudys Antonia Zapata, Ex. D. "At times we became very concerned about him because he was rarely at home." Letter of Yasmel Montero Zapata.

Behind in academic credits, Carlos attended an alternative high school. But he couldn't catch up. And his Bronx neighborhood, like his hometown in the Dominican Republic, was plagued by violence. Carlos recalls a day he witnessed a police raid that gutted his neighborhood. The family agreed that Carlos should move to Massachusetts to live and work with his uncle.



Boston was not the reprieve Carlos envisioned. Each morning, he opened his uncle's store, attended school, and returned to close the store at the end of the day. He earned very little. Overcome by anxiety over his family's financial strain, Carlos yearned to earn enough to alleviate their burden. But he could not achieve this in Boston. The financial constraints coupled with interpersonal conflict with his uncle's girlfriend led Carlos to return to New York.

Back in the Bronx, Carlos began working full time at Nycon as a laborer for the concrete supply company. Presentence Report ¶ 90. He worked there until he was 17 years old, when he earned his OSHA license. *Id.* ¶ 82. He then began working for a company called Mixed Greens, where he lifted, loaded and unloaded heavy equipment to help set up events. *Id.* ¶ 87. The job was lucrative but the work inconsistent. As event opportunities dwindled, Carlos sought a more stable income. He applied to the MTA and dreamt of becoming a Navy Seal, but without a high school diploma his opportunities were limited. He began working for Uber Eats. But he could barely make ends meet.

### B.      *The offense conduct*

In 2023, the Montero family—Carlos's father, mother, and sister—pooled their resources to open a Dominican restaurant in their Bronx neighborhood. "Carlos went out of his way to step in to help whenever he could, not only with the restaurant but with helping [his sister] care for [her] children by picking them up for school and watching them…." Letter of Yasmel Montero Zapata, Ex. C.

The goal of the family restaurant was manifold: to generate a steady source of income for the family and to create an environment where Carlos's mother could work, surrounded by family. For several months after it first opened, Carlos worked at his family's restaurant. He "assisted with various tasks, including delivering food, stocking shelves, throwing out the garbage and handling various maintenance responsibilities." Presentence Report ¶ 86.



Then, tragedy struck. On December 11, 2023, a nearby building collapsed, causing irreparable damage to storefronts, including Carlos's family's business. *See* PHOTOS: Bronx apartment building partially collapses, dramatic aftermath, N.Y. DAILY NEWS (Dec. 12, 2023), https://www.nydailynews.com/2023/12/11/photos-bronx-six-story-apartment-building-collapses/. "The stress of maintaining and running the restaurant was a lot on its own, but after the ceiling collapsed we couldn't make any profit." Letter of Yasmel Montero Zapata, Ex. C.



The restaurant was in disrepair; they had to shut down. "[W]hile waiting for permission from New York City officials to re-open, they were still required to pay rent and other assorted expenses." Presentence Report ¶ 37. Carlos and his family were destitute.

"We went into significant debt to repair the damage done to the property, as our landlord expected us to continue paying rent even though we weren't making any profit. We had to sell our car and ask for money from family members to help us stay afloat. While we were closed the business also started to become infested with rats." Letter of Ediltrudys Antonia Zapata, Ex. D. Carlos's father, who had for years lived on his own, could no longer afford his rent. He moved into a bedroom in a shared apartment with strangers. The family could "barely [ ] afford anything in 2024" before finally selling the business. *Id.*

Carlos's mother became suicidal. On one particularly dark day in early 2024, Carlos recalls having to pry pills from his mother's hand "and essentially 'choked' her in order to prevent her from swallowing them." Presentence Report ¶ 37. Carlos and his mother had been arguing, and Carlos blames himself for her suicide attempt. Ever since, he has felt a deep sense of responsibility for his mother's well-being.

Against this backdrop, Carlos sold a gun for the first time. For three months, between June and September 2024, Carlos sold firearms and narcotics to two undercover officers. He did not

sell guns or drugs to anyone other than the undercover officers. As probation observes, "these acts were committed during the course of an undercover investigation, any potential harm which could have been caused was mitigated." Presentence Report at 37. Carlos never threatened anyone with a firearm, brandished a gun, or fired a shot. No one sustained any injuries as a result of the offense.

Carlos met with an undercover officer for the last time on September 4, 2024. For the next two months, despite an ongoing investigation into narcotics and firearms trafficking, he did not participate in any gun or drug sales. In August 2024, the police stopped Carlos when he was a passenger on a motorbike in the Bronx. He was not wearing a helmet. Carlos was arrested for the offense and taken to the precinct, where he was observed with "a small plastic bag containing three oxycodone pills and a brown paper bag containing an unknown pill." Presentence Report ¶ 56. He was not found with distribution quantity drugs. Notably, Carlos did not have any weapons of any kind at the time of his August arrest.

In early December 2024, two months after Carlos had cut off contact with the informant, he was arrested for the instant offense after he approached police officers who had detained his cousin. Carlos had no weapons or controlled substances on when he was arrested last December.

On December 5, 2024, Mr. Montero was charged by complaint with drug and firearms offenses in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846; 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; and 18 U.S.C. § 933(a)(3). Following a contested detention hearing, Mr. Montero was released with conditions, including home detention enforced by electronic monitoring.

Within two weeks of his arrest, Mr. Montero sought to accept responsibility for his actions. As Mr. Montero conceded to Probation, while "he was motivated by the financial constraints of his parents and out of a desire to help them," he immediately regretted his profound lapse in judgment. Presentence Report ¶ 37. In exchange for limited pre-indictment discovery and the government's consideration of a plea, Mr. Montero waived his right to indictment.

On May 5, 2025, Mr. Montero appeared in court prepared to accept responsibility for his actions. He sought to plead guilty, pursuant to a plea agreement, to an information charging one count of 21 U.S.C. § 841(b)(1)(B), conspiracy to distribute and possess a cocaine, and one count of 18 U.S.C. § 933(b), conspiracy to traffic firearms. At the plea hearing, the Court directed the parties to address several concerns it raised with the proffered plea agreement, including whether the plea agreement itself was constitutional. The parties briefed the issues and the Court issued an opinion declaring the agreement constitutional.

On July 30, 2025, Mr. Montero again appeared in Court ready to accept responsibility. During his plea allocution to Count One of the information, conspiracy to distribute narcotics in violation of 21 U.S.C. § 841(b)(1)(B) and § 846, Mr. Montero stated that from June 2024 to September 2024 in the Bronx, he agreed with other people to possess and sell and did sell more than 40 grams of controlled substances containing a detectable amount of fentanyl. In response to questioning by the Court, Mr. Montero explained that he began selling drugs last summer out of desperation after the building that housed his family's business collapsed, leaving his family without income. He indicated that he directly sold to an undercover officer what Mr. Montero believed to be a controlled substance—pills he had purchased from another individual.

The Court expressed concern over whether Mr. Montero must have *known* that the pills contained fentanyl in order to be found guilty of 21 U.S.C. § 841(b)(1)(B)—which carries a mandatory minimum sentence of five years' incarceration—and inquired whether selling the same amount of Percocet would violate the law. The Court ordered the parties to brief the question of the *mens rea* required for the offense and adjourned the plea hearing to August 8.

On August 8, the Court agreed that because Mr. Montero's participation in the charged conspiracy involved "directly and personally" selling a controlled substance to an undercover officer, the government need only establish that he believed the drugs he sold "contained a controlled substance of one type or another." Mr. Montero accepted responsibility for the offense and the Court entered his guilty plea.

Mr. Montero has remained in the community on home detention since his arrest and has largely complied with his conditions of release. Presentence Report ¶¶ 4–5. Though Mr. Montero has returned some positive drug tests while on pretrial release he has been "participating in focused treatment with his substance abuse counselor, continues to be employed, and there has been no known contacts with law enforcement." *Id.* ¶ 5.

Mr. Montero is scheduled to appear for sentencing on December 17 at 3:00 pm.

## II.    Sixty months of incarceration is the most appropriate sentence for Carlos Montero Zapata.

The parties agree on Mr. Montero's advisory sentencing range under the Guidelines. Pursuant to the terms of the plea agreement, the parties stipulated that Mr. Montero was in Criminal History Category I, with only one prior conviction for a non-violent misdemeanor offense in 2018, and a non-criminal disorderly conduct violation. At offense level of 28, the resulting Guideline range is 78 to 97 months' incarceration, with a mandatory minimum term of 60 months' imprisonment. Probation agrees with the parties' analysis and recommends the mandatory minimum sentence on each count to run concurrently, acknowledging that "[w]hile [Mr.] Montero Zapata is not a first-time offender, his prior criminal record is for comparatively minor offenses and the instant offense will mark the first custodial sentence imposed." Presentence Report at 37. His "relatively young age and history of gainful employment, as well as his compliance with the conditions of his pretrial supervision…are also mitigating factors to be considered." *Id.*

As this Court is well aware, "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). In exercising this discretion, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)," which requires the Court to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)": "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (quoting *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010)). In determining the appropriate sentence, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (citations omitted).

In accordance with these principles, the Court should sentence Mr. Montero to 60 months' incarceration.

### A.    Carlos Montero Zapata's community ties are a reason to impose a sentence of 60 months' incarceration.

Mr. Montero's offense conduct does not reflect his character. By all measures, he is "someone who cares about others and who, despite difficult circumstances, has always shown love and respect towards his family." Letter of Ediltrudys Antonia Zapata, Ex. D.

The week of Mr. Montero's arrest, his mother was diagnosed with stage 3 breast cancer. Carlos was devastated. "'The unexpected news got me so in shock that I completely shut down, not caring about anything more than her situation….'" Letter of Focus Forward, Ex. E. Within days, his mother—with whom Carlos lives, along with his little brother—began chemotherapy treatment. "Carlos has been a fundamental support" for his mother. Letter of Ediltrudys Antonia Zapata, Ex. D.

> He has been by my side during the hardest moments, accompanying me to medical appointments, translating important information for me because I don't speak English, helping me with my treatments and giving me strength when I needed it most. His presence, his words of encouragement and dedication have given me hope to keep fighting. Despite his own problems, he has never stopped taking care of me with love and commitment.

*Id.*

With his brother in college, his sister residing in Connecticut, and his father working full time and living apart from his mother, Carlos has assumed the lion's share of his mother's caregiving at home. "Carlos has really stepped up and started cooking, cleaning the house more than it's ever been cleaned, and making sure everyone has what they need." Letter of Anthony Montero Zapata, Ex. F. He also helps bathe his mother, assembles her medications, and gets her dressed for doctor's appointments. "He has shown her serious commitment and consideration." Letter of Focus Forward, Ex. E.

Of course, Ms. Zapata's illness has taken its toll on Carlos. "I've had to watch my mom fight this and there are no words to describe how hard it has been. It's been very hard for my family to wrap their heads around my case and her sickness." Letter of Carlos Montero Zapata, Ex. B. To cope, Carlos relied on marijuana, and, at times, oxycodone.

In July, Carlos began attending outpatient treatment at Samaritan Daytop Village in the Bronx. Presentence Report ¶ 5. There, he meets with a counselor weekly, and has shared his feelings about his mother's health condition.

> *fine. Clinician asked him what is going on which he stated, "my mother is sick and I am worried about her because she is like really bad right now and even though the home attendant is here I'm just worried about her," which clinician understood and wished his mother a speedy recovery which he was thankful for. Clinician then asked him how he was feeling in reference to his physical health which he stated, "not too bad." Clinician asked him how he was feeling in reference to his mental health which he stated, "I'm fine, a little stressed out because of my mother being sick but that's about it." Clinician then asked Carlos about his*

When Carlos could not attend a counseling session in person because he needed to accompany his mother to the New York City Human Resources Administration (HRA) because their electricity had been shut off for nonpayment, he dutifully sought telehealth counseling.

> **Description of problems being addressed in this session:** *Carlos Montero-Zapata was scheduled for an individual session with clinician on the date 9/11/25. Carlos had contacted clinician prior to his scheduled appointment time and was provided with tele-health services which he was receptive to. Clinician initiated the session by asking Carlos how he was feeling which he stated, "I'm okay, my bad about today but I won't be able to make it," which clinician understood and explained it is fine. Clinician asked him what is going on which he stated, "my mother is still sick, and she got me at the HRA office for her right now because she had gotten notices from her electric company that they dropped her coverage with the bills," which clinician understood. Clinician asked him if his mother is doing any better which he stated, "she is hanging in there and everything seems the same*

Carlos also speaks with his counselor about his reliance on marijuana to cope with his mother's illness and the ramifications of his offense. He understands that marijuana, while legal in New York State, remains on the federal controlled substances schedule, and has struggled with his dependency. On the advice of his treatment counselor, Mr. Montero sought and received a New York State Medical Cannabis Patient Certification. Medical Marijuana Certification, Ex. GX.

"Despite his own struggles, he has never given up or failed to show his love for my mom. His actions have taught me a lot about his strength and his sensitivity." Letter of Anthony Montero Zapata, Ex. F.

"The past few years have been very difficult for our family and Carlos has really been there for all of us." *Id.* This includes his brother, who is six years younger. "For as long as I can remember, my brother has been a very important person in my life." *Id.* Carlos taught his brother "the value of keeping my space clean, working hard, and having a job." *Id.*

Carlos has also enjoyed "a very loving and special relationship" with his nephews, who "admire him and love him very much." Letter of Yasmel Montero Zapata, Ex. C. "Carlos has always been an attentive, protective and present uncle in their lives. He teaches them values, plays with them, listens to them and encourages them to be excellent students and good people. The connection they have is very nice, and his nephews feel great affection and admiration for him. I am convinced that his example and love have a very positive influence in their growth." *Id.*

After months at home caring for his mother, Mr. Montero secured full time employment this summer. In early July, Mr. Montero began working for Beryann Supply, LLC, a beauty supply company in the Bronx, where he is a stock clerk and security guard. Presentence Report ¶ 85. He is proud of his position and takes his job seriously, as it is now an important financial resource for his family.

### B.      *A sentence of 60 months' incarceration would not create unwarranted sentence disparities.*

A sentence of 60 months' incarceration would be consistent with the sentences imposed on defendants convicted of similar offenses and would therefore not create "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Individuals in this District facing a mandatory minimum sentence of 60 months' incarceration for conduct similar to Mr. Montero's—and in some cases, more egregious—are routinely sentenced to 60 months. This includes cases involving shootings, with defendants with lengthier records of criminal and often violent conduct:

*United States v. Gurley*, 25 Cr. 44 (JGK): plea to one count of 21 U.S.C. § 841(b)(1)(B) and one count of 18 U.S.C. § 922(g) for selling both drugs and guns where defendant with two prior felony convictions for criminal possession of a firearm and possession of narcotics with intent to distribute was sentenced to 5 years' incarceration

*United States v. Murray*, 20 Cr. 667 (VEC): plea to one count of 18 U.S.C. § 924(c)(1)(A)(i) where defendant with eight prior convictions who distributed significant amounts of crack cocaine was sentenced to 5 years' incarceration

*United States v. Luis Garcia*, 20 Cr. 667 (VEC): plea to one count of 18 U.S.C. § 924(c)(1)(A)(i) where defendant with a criminal history and a pending assault charge who was a member of a drug trafficking organization, was observed distributing crack cocaine approximately 10 to 15 times and possessed a semi-automatic handgun was sentenced to 5 years' incarceration

*United States v. Ricardo Garcia*, 20 Cr. 667 (VEC): plea to one count of 18 U.S.C. § 924(c)(1)(A)(i) where defendant with a criminal history, who was a member of a drug trafficking organization, distributed crack cocaine and possessed a semi-automatic handgun was sentenced to 5 years' incarceration

In cases where individuals with a more extensive criminal history than Mr. Montero were sentenced for similar conduct but not subject to a mandatory minimum sentence, the sentences imposed were well below 60 months' incarceration.

*United States v. Sims*, 24 Cr. 253 (KMK): plea to one count of 21 U.S.C. § 841(b)(1)(C) and one count of 18 U.S.C. § 922(g) where defendant with prior felony convictions for robbery and criminal sale of a controlled substance who sold firearms, cocaine and fentanyl over a period of several months was sentenced to time served (14 months' incarceration)

*United States v. Porter*, 23 Cr. 458 (LGS): plea to one count of 21 U.S.C. § 841(b)(1)(C) where defendant with prior youthful offender adjudication for robbery who brandished a gun at an individual and sold more than 840 grams of crack cocaine over two years was sentenced to 18 months' incarceration

*United States v. Blyden*, 22 Cr. 265 (ER): plea to one count of 21 U.S.C. § 841(b)(1)(C) with agreement not to contest that defendant engaged in a shooting where defendant sold multiple firearms and ammunition in connection with his drug trafficking activity was sentenced to 24 months' incarceration

*United States v. Wilbright*, 20 Cr. 667 (VEC): plea to one count of 21 U.S.C. § 841(b)(1)(C) where defendant in Criminal History Category III with prior gun and narcotics convictions

was a member of a drug trafficking organization who possessed a gun and personally sold 840 grams of crack cocaine was sentenced to 24 months' incarceration

*United States v. Zayas*, 22 Cr. 178 (NSR): plea to one count of 21 U.S.C. § 841(b)(1)(C) where defendant who recently served 48 months' incarceration for narcotics trafficking possessed two semiautomatic firearms along with 84 grams of crack, 49 grams of cocaine, a digital scale with white powder, drug packaging material, and nearly $19,000 cash was sentenced to 48 months' incarceration

*United States v. Edwards*, 20 Cr. 618 (VB): plea to one count of 21 U.S.C. § 841(b)(1)(C) and one count of 18 U.S.C. § 922(g)(8) where defendant in Criminal History Category IV who was found with a loaded firearm and heroin, crack cocaine, hundreds of glassine envelopes, a scale and coffee filters with crack cocaine next to what appeared to be recently cooked crack cocaine was sentenced to 18 months' incarceration

Accordingly, a sentence greater than 60 months' incarceration is unwarranted and unnecessary under 18 U.S.C. § 3553(a).

### C.      *Carlos Montero Zapata has a distinct capacity for rehabilitation.*

Carlos was just 25 years old when he first sold a gun to an undercover officer 18 months ago. He was wrong. But the law recognizes young adults' unique capacity for change. In *Miller v. Alabama*, the Supreme Court insisted that "a sentencer have the ability to consider the 'mitigating qualities of youth.'" 567 U.S. 460, 476 (2012) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)).

> As we observed, "youth is more than a chronological fact." It is a time of immaturity, irresponsibility, "impetuousness[,] and recklessness." It is a moment and "condition of life when a person may be most susceptible to influence and to psychological damage." And its "signature qualities" are all "transient."

*Id.* at 367, 472 n.5 (internal citations omitted) ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance.").

While Supreme Court jurisprudence on youth offenders captures individuals under 18 years old, adolescent brains continue to develop through a person's mid-20s. "The frontal lobes, homes to key components of the neural circuitry underlying "executive functions" such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." Johnson, *et al.*, *Adolescent Maturity and the Brain*, J. Adolescent Health 2009. Social science literature recognizes that "relative to adults, adolescents demonstrate impaired decision making in emotionally arousing contexts." Grace Icenogle, et al., *Adolescents' Cognitive Capacity Reaches Adult Levels Prior to Their Psychosocial Maturity: Evidence for A "Maturity Gap" in A Multinational, Cross-Sectional Sample*, 43 LAW & HUM. BEHAV. 69, 71 (2019).

This is particularly apt here. To be sure, the offense occurred over a few months and involved a number of transactions. But Carlos made an "impaired decision" after witnessing his mother's attempt to end her life in the immediate aftermath of his family's financial unraveling. This was not a decision made with true deliberation, but rather one made in "emotionally arousing" circumstances. This is not an excuse for Carlos's behavior. He will lose five years of his life to prison for his mistakes. More time than that is simply unwarranted under these circumstances.

**D.    *A sentence of 60 months' incarceration is "sufficient, but not greater than necessary" to achieve a deterrent effect.***

Carlos Montero Zapata committed a serious offense that warrants a sentence sufficient to deter him from ever again engaging in such conduct. For Mr. Montero—who has never before been sentenced to any period of incarceration—sixty months of incarceration, the least time permissible by law, is that sentence.

As Mr. Montero has proven over the past 12 months, a prolonged period of incarceration is unnecessary for incapacitation or to protect the public.

Nor is more than five years of incarceration necessary as a specific deterrent. "While this has been very hard on me, I have tried my best to grow from all of this. I've been completing programs. I've done treatment at Samaritan Village. … I graduated from Focus Forward. I've maintained a job and currently work as a security guard at a beauty supply store." Letter of Carlos Montero Zapata, Ex. B. With the exception of a few positive drug tests, Mr. Montero has complied with the conditions of community supervision since his arrest 12 months ago. Notably, Mr. Montero has been entirely compliant with the condition of home detention, which requires him to remain at home except to work, attend court, meet with counsel, or for medical care.

Indeed, Mr. Montero has exceeded the requirements of pretrial supervision. In June, Mr. Montero graduated from the Focus Forward Project, a virtual "13-week course is designed to provide both an intellectual and emotional outlet for participants as they navigate the stress and uncertainty of the pretrial phase of their federal cases." Letter of Focus Forward, Ex. E. The course required Mr. Montero to "complete weekly reading, journal, and other homework assignments." *Id.* "From the beginning, we knew Carlos took Focus Forward seriously. He was attentive and always completed his homework." *Id.* During the program, Carlos expressed his intent "to pursue his goal of a stable, productive job through his determination to do better, to be disciplined, and by focusing on his mental health, staying positive in order to achieve success." *Id.*

To that end, Mr. Montero's steady employment over the last several months is indicative of his low risk of recidivism. "Indeed, study after study has shown—and the government has repeatedly acknowledged—that secure employment is one of the best ways to combat repeat criminal conduct." *Doe v. United States*, 168 F. Supp. 3d 427, 429–30 (E.D.N.Y. 2016) (internal citations omitted).

Likewise, the sentencing aim of general deterrence will not be satisfied with a term of incarceration greater than 60 months. As the Honorable John Gleeson has recognized, general deterrence is "a phenomenon that is notoriously difficult (and perhaps impossible) to measure."

11

*United States v. Brady*, No. 02 CR 1043(JG), 2004 WL 86414, at *9 (E.D.N.Y. Jan. 20, 2004). Indeed, "determinations regarding general deterrence may be highly subjective, and we must be careful that the individual defendant is not lost in a stereotype." *United States v. Cavera*, 550 F.3d 180, 223 (2d Cir. 2008) (Sotomayor, J., concurring in part).

Despite this, the government will likely argue that a Guideline sentence of 78 to 97 months' incarceration is necessary to deter individuals from selling guns and drugs. But no one in the Bronx is going to decide whether to engage in this offense because Mr. Montero is sentenced to eight years in jail rather than five. "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." U.S. Department of Justice, *Five Things About Deterrence* 1, National Institute of Justice (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf. "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." *Id.*

Individual defendants' sentences, like Mr. Montero's, should not be exploited to serve the broader aims of the justice system. This is particularly true of those who commit street-level drug and firearms offenses. *Cf. United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Stein*, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) ("Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed.").

To the extent that this Court is concerned with sending a message to the community, sixty months of incarceration satisfies that aim. Any additional time is simply unwarranted in light of the factors the Court must consider pursuant to 18 U.S.C. § 3552(a).

12

III.    **Conclusion**

Carlos appreciates the consequences of his actions and has already made strides toward rehabilitation. "During the last few months, I have been able to observe a real and sincere change in Carlos' attitude," his father reveals. Letter of Carlos Manuel Montero, Ex. A. "He is reflecting on what happened, receiving psychological help, getting closer to his family again and seeking to resume his studies so he can build an honest and stable life. His greatest desire is to regain the trust of us who love him and show that he can be a responsible, hardworking and good man." *Id.*

For Carlos Montero, who has spent the past year caring for his ailing mother, five years of incarceration is sufficiently punishing. "I now must face being separated from her soon and not knowing if she will survive my sentence." Letter of Carlos Montero Zapata, Ex. B.

Thank you for your consideration of Mr. Montero's request for a sentence of 60 months of incarceration.

Respectfully submitted,

*/s/*

Marne L. Lenox

*Counsel for Carlos Montero Zapata*

cc:    Katherine Cheng, Assistant U.S. Attorney
       Diarra Guthrie, Assistant U.S. Attorney